**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Russell T. RENO, Defendant–Appellant.**

**No. 92–1637.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1993.

Decided May 6, 1993.

Barry R. Elden, Asst. U.S. Atty., Matthew C. Crowl (argued), Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Terence F. MacCarthy, Carol A. Brook, Sergio F. Rodriguez (argued), Office of Federal Public Defender, Chicago, IL, for defendant-appellant.

Before CUMMINGS and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Russell Reno (Reno) appeals his conviction and sentence for bank robbery in violation of 18 U.S.C. § 2313(a). During the jury trial, Reno relied on an insanity defense. Reno was found guilty and was sentenced by the district court to 41 months incarceration followed by five years of supervised release. On appeal, Reno argues that the government was allowed to ask "ultimate issue" questions of its expert in violation of Federal Rule of Evidence (FRE) 704(b) and that the district court erred in refusing to allow a two-level reduction in his base level offense for acceptance of responsibility pursuant to United States Sentencing Guideline § 3E1.1. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. For the reasons that follow, we affirm both the conviction and the sentence.

I.

Russell Reno robbed the Broadway Bank ("Bank"). Upon leaving the Bank, Reno started to run after he discovered a security guard chasing him. In order to hide from the security guard, he went to a nearby home and asked to use the phone. Upon leaving the home, he removed the money from his briefcase and hid the briefcase. Reno got into a taxi and went to his home. Police found him there hiding in the bathroom. Reno initially refused to come out of the bathroom, but he eventually did and the money was found under the bathroom waste basket.

There has never been any question that Reno suffers from the mental disease chronic paranoid schizophrenia. He has a long history of schizophrenia and hospitalization. After his pre-trial appearance, his release order was modified and Reno was designated to the Federal Medical Center in Rochester, Minnesota (Rochester) for psychiatric evaluation.

At Rochester, Reno was examined and treated by Dr. James Thrasher. He testified as the government's psychiatric expert in the case and reported that Reno was delusional and psychotic. Reno responded to treatment and recounted for Dr. Thrasher the events of the bank robbery. Although Dr. Thrasher concluded that Reno was suffering from mental illness at the time of the bank robbery, he ultimately concluded that Reno was not legally insane at that time because he understood the nature and wrongfulness of his acts.

Based on the findings of mental illness, Reno filed a Notice of Insanity Defense and a motion in limine pursuant to FRE 704(b) to limit expert testimony regarding his mental state at the time of the bank robbery. The district court specifically noted that both parties seemed to understand Rule 704(b). At trial, Reno did not dispute that he committed the bank robbery. The only issue was whether he was legally insane.

During direct examination, the prosecution questioned Dr. Thrasher about schizophrenics in general and about Reno specifically. Reno also presented his own medical expert. Ultimately rejecting his insanity defense, the jury found Reno guilty of bank robbery. At sentencing, Reno requested a two-level adjustment in his base level offense for acceptance of responsibility. The district court refused to grant the adjustment and sentenced Reno to 41 months incarceration and five years supervised release.

Reno argues on appeal that the testimony given by Dr. Thrasher violated Federal Rule

of Evidence 704(b) because Dr. Thrasher's testimony stated an opinion or inference that Reno was legally sane. He also argues that the district court's conclusion that he had not accepted responsibility was clearly erroneous.

## II.

### A. Expert Testimony

█ Reno first claims that the district court improperly allowed expert testimony on the ultimate question of Reno's mental state in violation of Fed.R.Evid. 704(b), which provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Reno "bears a heavy burden in raising such a claim, as the trial judge has broad discretion on evidentiary rulings and we will only overturn such rulings for a clear abuse of that discretion." *United States v. Lake*, 910 F.2d 414, 418 (7th Cir.1990) (citing *United States v. Herrero*, 893 F.2d 1512 (7th Cir.1990).[1]

█ The "ultimate issues" where the defendant raises insanity as his defense at trial are whether the defendant "appreciated the nature and quality or the wrongfulness of his acts," or in other words whether the defendant knew that what he was doing was wrong. 18 U.S.C. § 17; *United States v. West*, 962 F.2d 1243, 1246 (7th Cir.1992). Medical and psychological knowledge provides the jury with data that will assist it in determining the existence of the defense. An expert can help the jury understand mental illness and its symptoms and effects.

The following colloquy took place during direct examination of Dr. Thrasher.

Q: Now, does how a person behaves after committing a crime, whether the person maybe hides, tries to conceal the crime, does that factor in at all to your analysis when you're trying to decide whether or not someone knows what they did was wrong or knows what they did?

A: Well, yes.

Mr. Mac Carthy: Your Honor, again I object to the knows what they did was wrong part. Other than that I have no objection.

Ms. Finnegan: Judge, I think he's an expert in—.

The Court: All right. The objection is overruled.

Q: How does it enter into relevant analysis?

A: Well, if the person has a particular delusion—.

Q: I'm sorry. I'm having a little trouble hearing you, too. If you could keep your voice up.

A: Yes. If a person has a particular delusion—in this case Russell Reno told me he was president of the United States—and if he had also the delusion that he had every access to all money in that bank and it was properly his to take, I would expect him to walk in there and announce in keeping with his delusion that I'm the president and this is my money. Give it to me, much as he did in the hospital when I saw him concerning mostly cigarettes.

If he did otherwise, if he were to take a course of action—in spite of having those very same ideas, take a course of action that was specifically designed to evade and escape detection and not be found out, it would mean an entirely opposite thing, that he had the ability to appreciate the nature and quality of what he was doing, and appreciate the wrongfulness of it. In the first instance he wouldn't. He would be perfectly justified and his mental illness would be driving his ability.

(Tr. 205–7).

█ In *United States v. Hillsberg*, 812 F.2d 328, 332 (7th Cir.), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987)

---

1. Reno alleges that the question presented to Dr. Thrasher was a hypothetical that allowed him to testify on the ultimate issue. The Government contends that Reno is really objecting to Dr. Thrasher's answer and not the question and that because there was no motion to strike, Reno waived this argument. However, Reno did object to the question, and Dr. Thrasher answered the question as it was presented to him. Therefore, we find no waiver of this issue.

we held that a long and complicated hypothetical question that restated the legal test for sanity violated FRE 704(b). "Rather than using expert opinion to help the jury understand the factual issues in the case, the question called for the jury to take on faith the opinion of the expert as to [the defendant's] ability to form the intent required...." *Id.* While complicated hypothetical questions that restate the legal test for sanity are therefore not allowed, questions regarding the presence of a mental disorder or the characteristics of the disease are clearly allowed. *United States v. West,* 962 F.2d 1243 (7th Cir.1992).

■ In his concurring opinion in *West,* Judge Manion noted that "Rule 704(b) does not prohibit psychiatrists from presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what *the characteristics of such a disease or defect,* if any, may have been." *Id.* at 1251 (internal quotation marks and citations omitted) (emphasis in original). The government is allowed to ask questions and explore the particular characteristics of the mental disease and whether those characteristics render a defendant able or unable to appreciate the wrongfulness of his acts. "Such questions are merely questions about the characteristics of the mental disease, as opposed to subjective questions leading to conclusions about the defendant's personal knowledge, intent or ability." *Id.* (footnote omitted).

■ Dr. Thrasher's testimony is of the type Judge Manion described. He testified that Reno suffered from chronic paranoid schizophrenia. He also testified that someone suffering from this illness experiences delusions and that Reno indeed experienced delusions. He testified that just because someone is delusional it does not mean that he cannot understand that his acts are wrong. To assist the jury in determining whether Reno was acting consistently with a delusion or whether the delusions from which he suffered did not affect his behavior on the day of the robbery, Dr. Thrasher described what a person acting consistently with a delusion might do. Unlike the question and answer presented in *Hillsberg,* which restated the legal standard and was not phrased in psychological terms, Dr. Thrasher was describing characteristics of a mental illness. His testimony is exactly the kind that Rule 704 permits.[2]

■ Reno points out that Dr. Thrasher mentioned Reno by name and used one of the delusions that Reno experienced as an example. Reno then concludes that the use of this example misled the jury. Reno reaches this conclusion because he believes Dr. Thrasher's use of the president delusion led the jury to believe that was the delusion Reno suffered at the time of the bank robbery. Because Reno did attempt to flee and conceal his behavior, he concludes that the jury must have believed he was not acting consistently with the delusion of being president when, in fact, Reno alleged that he suffered from the delusion of being a CIA agent at the time of the bank robbery. We do not think that this testimony is misleading. It was up to Reno to point out to the jury that he did not assert that he was suffering from the delusion of being President of the United States but that he thought he was a CIA agent picking up his pay at the time of the robbery. Reno bore the responsibility of convincing the jury that his attempt to flee was consistent with his delusion. Indeed, Reno questioned Dr. Thrasher on cross examination to prove exactly this point.[3]

Because Dr. Thrasher's testimony was merely of the type that would help the jury understand Reno's illness, the jury was free to consider that testimony along with evidence of Reno's behavior in reaching its con-

2. In fact, FRE 702 provides that expert testimony is admissible when "the specialized knowledge [of the expert] will assist the trier of fact to understand the evidence or to determine a fact in issue...." Dr. Thrasher's testimony was exactly of this sort. It assisted the jury in understanding paranoid schizophrenia and how a person might behave if acting consistently with the illness.

3. On cross-examination of Dr. Thrasher, the following colloquy took place:

Q: Incidentally, if—you talked a little bit about if somebody walked in to rob a bank with the delusion that they were the president and you talked a little bit about what that person might do when they walked into the bank. Do you understand?
A: Yes.
Q: Okay. And maybe—I don't recall, but I think you said he'd just simply walk in as the president and ask for all the money?

clusion about Reno's defense of insanity. Dr. Thrasher's testimony was helpful and in no way invaded the jury's province. We do not think that Judge Zagel abused his discretion in allowing the testimony, and we affirm Reno's conviction.

### B. Acceptance of Responsibility

Reno also argues that the district court committed error in refusing to grant him a two-level reduction in his base level offense for acceptance of responsibility. As a part of the Presentence Investigation, Reno submitted a Defendant's Version of the Offense. In it, Reno attempted to explain his actions. He wrote:

> Now that I look back I know I was wrong and I am very ashamed because I could not control my illness and I am sorry I did not continue the treatment that was necessary to bring me back to reality. I understand now that the refusal to continue the treatment was part of my illness. I would like to apologize to the teller for putting him through the fearful situation that he was put in by me and I am glad that no one was hurt because of my actions. I would also like to apologize to my family and every one involved in this case. I was found guilty by a jury, and now an prepared to face the consequences for my actions.

(Defendant's Version of the Offense, 2).

At the sentencing hearing, the Government argued against the adjustment because of the timing of the acceptance and because, by presenting an insanity defense, Reno was not eligible for the adjustment. The district court refused to accept the Government's arguments, but did agree with the probation officer that Reno was not entitled to the credit. The court held:

> Moreover, I think very few persons who plead not guilty really wind up entitled to acceptance of responsibility. The paradigm case of someone who pled not guilty who might be entitled to acceptance of responsibility is someone whose defense

A: I said he might do that if he was acting in keeping with the delusion, yes.
Q: And, of course, if in his mind the person—the schizophrenic who walked into the bank, if in his mind his delusion was not that of being the president, he might act differently?

was on the ground of mental disease or defect, because it might very well be that they accept responsibility in a moral sense and deny responsibility in the legal sense, and I believe that acceptance of responsibility as dealt with in the guidelines means acceptance of responsibility in the moral sense, not strictly in the legal sense.

> And although the defense of insanity is on its face inconsistent with acceptance of responsibility because the defense of insanity is thought to be a denial of responsibility, it's a use of the word responsibility in two different senses. Responsibility is a legal scholar's word for lacking mental state.

> I just think in this case he did not and perhaps not even now accepts responsibility in the moral sense. He essentially blames what occurred on his illness, and I don't think that's acceptance of responsibility, and I think the probation officer was correct. (T. 522).

■ Whether Reno accepted responsibility is a factual question for the district court. Thus, we will affirm the district court's determination that Reno did not accept responsibility unless it is clearly erroneous. *United States v. Beal,* 960 F.2d 629, 632 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992).

■ Reno's argument is similar to the one made by the defendant in *United States v. Beserra,* 967 F.2d 254 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 341 (1992). Beserra attempted to blame his crime on his drinking and falling in with bad people. In affirming the district court's decision that Beserra was not entitled to the credit, this circuit noted:

> A person who is conscious of having done wrong, and who feels genuine remorse for his wrong rather than indignation at being a victim of circumstances—of poverty or drink or a brutal upbringing or whatever else may have predisposed him to criminal activity—is on the way to developing those internal checks that would keep many peo-

A: He might, true.
Q: He might act more in a covert way?
A: Yes.
Tr. 235–236.

ple from committing crimes even if the expected costs of criminal punishment were lower than they are....

"Judicial inquiry into acceptance of responsibility is a search for expiatory deeds and, failing those (for the defendant may have had no opportunity to perform such deeds), for conscience."

*Id.* at 256.

We understand the difficulty that this case presented to Judge Zagel. The district court's finding that Reno did not accept responsibility in the moral sense is essentially a finding that, as Judge Posner put it in *Beserra,* Reno did not demonstrate "conscience." As we noted in *Beserra,* there are two ways to interpret a situation where a defendant blames circumstance for his behavior. The first interpretation is that when a defendant acknowledges the role of circumstance in his criminal activity, he is making the first step toward reform. The other interpretation is that the person blaming circumstance is trying to avoid responsibility. Because we find that there are two permissible views of the evidence, we cannot say that the district court's finding was clearly erroneous. *United States v. Beal,* 960 F.2d 629, 632 (7th Cir.1992).

■ Reno's second argument regarding the acceptance of responsibility adjustment is also without merit. He argues that the district court failed to consider the factors listed in Application Note 1 to Sentencing Guideline § 3E1.1. Reno points out that in *United States v. Sullivan,* 916 F.2d 417, 420 (7th Cir.1990), this circuit held that there must be some indication that a "trial judge considered these factors when denying" the adjustment. However, Reno ignores the more recent *Beal* case. In *Beal,* this Court stated:

[W]e have only recently upheld a district court's refusal to find an acceptance of responsibility even though the judge "failed to specifically state" his reasoning because "there [was] more than an adequate foundation in the record for such a finding." *United States v. Blas,* 947 F.2d 1320, 1330 (7th Cir.1991).

960 F.2d at 635.

While it is true that the district court did not tie its reasoning specifically to the categories listed in Application Note 1, the court did give a specific reason for its denial of Reno's request for an acceptance of responsibility adjustment. The factors in Note 1 are not an exhaustive list of relevant considerations. "Nevertheless, if the sentencing judge is relying on facts which fall under one of the categories listed in Note 1, it is helpful for purposes of review that the fact be tied to the appropriate category." *Beal,* 960 F.2d at 635.

In the instant case, the district court did not rely on facts that fell under any of the categories listed at Note 1. Therefore, the district court was not required to recite each category and explain why it was not relevant. The court was clear about its reasons for denying the departure. Therefore, *Sullivan* is not applicable, and Reno's case falls more easily into the category of cases to which *Beal* and *Blas* apply.

Affirmed.